WO

JDN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Johnny Ray Bollinger,

Plaintiff,

v.

NaphCare Incorporated, et al.,

Defendants.

No. CV-23-02008-PHX-DGC (MTM)

**ORDER**

Plaintiff Johnny Ray Bollinger, who is currently confined in the Arizona State Prison Complex (ASPC)-Lewis, Barchey Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against NaphCare Incorporated ("NaphCare") and Nurse Practitioner Grace Adams. (Doc. 1.) Before the Court are Plaintiff's Motion for Preliminary Injunction (Doc. 41) and Motion for Leave to Supplement Briefing (Doc. 81). The Court will grant the Motion for Leave to Supplement Briefing and grant in part the Motion for Preliminary Injunction.

## I.    Background

In his Complaint, Plaintiff set forth an Eighth Amendment medical care claim based on Defendants' alleged denial of adequate medical care for Plaintiff's psoriatic and rheumatoid arthritis. (Doc. 1 at 4, 9.) Prior to his incarceration, Plaintiff was prescribed methotrexate and Enbrel,[1] which were effective in treating his symptoms. (*Id.* at 4.)

---

[1] Methotrexate tablets are a dihydrofolate reductase inhibitor indicated for the treatment of rheumatoid arthritis and severe psoriasis. *See Methotrexate label*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/040054s015,s016,s017.pdf

Plaintiff alleged that Defendants have refused to provide him Enbrel, Special Needs Orders (SNOs) for assistive medical devices, and an appointment with a rheumatologist, despite a non-party doctor's recommendation for a specialist appointment. (*Id.* at 6–10.) Plaintiff alleged that his symptoms have worsened and have resulted in progressive disability when walking or performing other basic life activities. (*Id.* at 7.) Plaintiff requested damages and declaratory and injunctive relief. (*Id.* at 5.)

On October 21, 2024, Plaintiff filed his pending Motion for Preliminary Injunction, which seeks the following relief: an appointment with rheumatologist Dr. Ulker Tok within 14 days; a directive that all Dr. Tok's orders and recommendations be promptly followed; the administration of Enbrel as prescribed by Dr. Tok; a directive to schedule and ensure physical therapy; and a directive that Defendants file notices of compliance every 30 days. (Doc. 41 at 1–2, 20.)

On November 20, 2024, the Court ordered Defendants to file a response with complete medical records. (Doc. 42.)

On December 4, 2024, NaphCare filed its Response, which opposes the Motion in part because Plaintiff was scheduled to start biologic injection treatment the next day. (Doc. 49.)

On December 18, 2024, Plaintiff filed his Reply, stating that he had not yet started any biologic injection treatment. (Doc. 56.)

On March 11, 2025, Plaintiff filed his pending Motion for Leave to Supplement Briefing, in which he states that, to date, he has not had the 3-month follow up appointment that Dr. Tok ordered in October 2024. (Doc. 81).

**II.    Preliminary Injunction Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should

---

(last visited April 1, 2025). Enbrel is the brand name for etanercept, a tumor necrosis factor (TNF) blocker indicated for the treatment of rheumatoid arthritis and psoriatic arthritis. Enbrel is administered by subcutaneous injection. *See Enbrel (etanercept) Label*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/103795s5503lbl.pdf (last visited April 1, 2025). Enbrel is a biologic medication. *See Enbrel (etanercept), Nat'l Psoriasis Foundation*, https://www.psoriasis.org/enbrel/ (last visited April 1, 2025).

not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").  Nonetheless, "federal courts must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners," and must not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citation omitted).

A plaintiff seeking a preliminary injunction must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.  When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047.  The "balance of equities" concerns the burdens or hardships to a prisoner complainant compared with the burden on the government defendants if an injunction is ordered.  *Id.*  The public interest mostly concerns the injunction's impact on nonparties.  *Id.* (citation omitted).  Regardless, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).  Further, under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm.  18

U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

### III.    Motion for Leave to Supplement Briefing[2]

As set for below, in October 2024, Plaintiff saw rheumatologist Dr. Tok.  (Doc. 81 at 7.)  At that time, Dr. Tok ordered that Plaintiff return for follow up in 3 months.  (*Id.*)  In his Motion for Leave to Supplement Briefing, Plaintiff requests to supplement the record with the fact that, as of March 11, 2024, NaphCare has not scheduled Plaintiff for follow up with Dr. Tok as recommended in October 2024.  (*Id.* at 1.)

On March 25, 2025, NaphCare filed its Response, which opposes Plaintiff's Motion on the grounds that the Motion for Preliminary Injunction is fully briefed; Plaintiff only sought a particular medication, and that request is moot; and Plaintiff is scheduled to see the outside rheumatologist next week, so relief premised on seeing a rheumatologist is moot.  (Doc. 84.)

Plaintiff's Motion included not just a request for a particular medication—Enbrel— but also a request that NaphCare be directed to promptly follow all the rheumatologist's orders and recommendations.  (Doc. 41 at 1–2.)  The outside rheumatologist specifically ordered a follow-up appointment to occur three months after the October 21, 2024 appointment.  (Doc. 81 at 7.)  Thus, the supplemental fact that Plaintiff seeks to include in the record—that no such follow up has occurred—is related to his original request for injunctive relief.

NaphCare submits no evidence, such as a medical record or sworn statement from a medical official with personal knowledge, to support defense counsel's assertion that Plaintiff is scheduled to see the outside rheumatologist next week.  (*See* Doc. 84.)  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 923 (9th Cir. 2001) ("arguments of counsel, however, are not evidence") (internal quotation marks and citation

---

[2] Because the Court grants Plaintiff's Motion for Leave to Supplement Briefing, Plaintiff is not prejudiced by the Court ruling on the Motion before receiving Plaintiff's Reply.

omitted); *Single Chip Systems Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1052, 1062 (S.D. Cal. 2007) ("this Court cannot consider factual evidence that [is] only proffered by counsel").  Accordingly, Plaintiff request for a follow up appointment is not moot.

Finally, the fact that the Motion for Preliminary Injunction was fully briefed months ago is not a basis for disregarding supplemental facts for purposes of ruling on the motion. When addressing a motion for preliminary injunction, courts may consider evidence or developments that postdate the pleadings.  *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). Indeed, it is the defendant's current conduct that determines whether injunctive relief is warranted.  *Id.* at 845.

The Court will grant Plaintiff's Motion for Leave to Supplement Briefing and include in its analysis the fact that, to date, Plaintiff has not had the 3-month follow up that the specialist recommended in October 2024.

## IV.    Relevant Facts

In 2007, Plaintiff was diagnosed with psoriatic and rheumatoid arthritis.  (Doc. 41 at 1.)   These conditions cause severe pain and swelling in Plaintiff's joints, skin inflammation, rashes, psoriasis, and limited mobility.   (Doc. 1 at 4; Doc. 41 at 4.) Rheumatoid arthritis also impairs the immune system, which causes significant symptoms such as immune suppression, difficulty in recovering from infections, and fatigue. (Doc. 41 at 4.)   Prior to incarceration, Plaintiff was treated by Dr. Steven Baak, a rheumatologist practicing in St. Louis, Missouri.  (*Id.*)  Dr. Baak devised a treatment regimen that combined methotrexate and Enbrel, which effectively treated Plaintiff's symptoms.  (*Id.*; Doc. 1 at 4.)

When Plaintiff entered ADCRR custody in 2018, he informed medical officials of his diagnoses and treatment regimen at intake.  (Doc. 41 at 4.)   The intake provider informed Plaintiff that he could not receive Enbrel; Plaintiff was given only methotrexate. (*Id.* at 4, 27.)

NaphCare took over as the ADCRR contracted healthcare provider in October 2022. (Doc. 49 at 2.)

Starting at ASPC-Eyman, Special Management Unit (SMU) 1, and continuing at every facility at which he was housed, Plaintiff repeatedly requested a regimen of Enbrel injections at provider appointments, but he was consistently informed that Enbrel is not on the formulary and NaphCare does not approve Enbrel due to cost.  (Doc. 41 at 5.)  Providers instead provided numerous other medications that were ineffective, including Ibuprofen, Tylenol, Naproxen, and Meloxicam.  (*Id.*)

Plaintiff continued to complain via Health Needs Requests (HNRs) and the grievance system about his worsening symptoms, including worsening systemic joint pain, which made most daily living activities—movement, exercise, and basic functions—nearly impossible, and he requested to be given Enbrel and to see a rheumatologist.  (*Id.*; *see* Doc. 41-1 at 8, 9, 11–13.)

On May 25, 2023, Plaintiff saw NP Ellis via telemedicine and requested Enbrel.  (Doc. 41 at 5.)  NP Ellis informed Plaintiff that any treatment regimen involving Enbrel would be rejected by NaphCare due to the expense and NaphCare policy.  (*Id.* at 5–6.)

On June 7, 2023, Plaintiff saw NP Adams, who informed Plaintiff that there was no need for him to see a specialist because all they would do is monitor Plaintiff, and that can be done at the prison.  (Doc. 41-1 at 23.)

On August 25, 2023, Plaintiff saw Dr. Warren Tripp, who took Plaintiff's history and conducted a comprehensive examination.  (*Id.* at 2; Doc. 41 at 6.)  Dr. Tripp determined that Plaintiff's current medication regimen was ineffective, and he informed Plaintiff that he would submit a request for Enbrel.  (Doc. 41 at 6.)  The medical record noted "consider referral to Rheumatologist pending labs."  (Doc. 41-1 at 5.)  Plaintiff was not prescribed Enbrel thereafter.  (Doc. 41 at 6.)

In November 2023, Plaintiff was transferred to ASPC-Lewis, Barchey Unit, and he again requested an appointment with a rheumatologist and a prescription for Enbrel.  (*Id.*)  Plaintiff's requests were denied, and he was told multiple times during video appointments with providers that such medications are not prescribed due to their significant cost.  (*Id.*)

On November 28, 2023, Plaintiff saw Staff Physician Vikki Owen via telemedicine for a chronic care visit for asthma and rheumatoid arthritis.  (Doc. 49-1 at 24, 26.)  Dr. Owen documented Plaintiff's report that he was "doing ok" and "he hasn't needed an inhaler."  (*Id.* at 26.)

On February 22, 2024, Plaintiff saw Dr. Abdelmohaymin Abdalla for a chronic care visit for asthma and psoriatic and rheumatoid arthritis.  (*Id.* at 40, 42.)  The medical record documented Plaintiff's report that his psoriatic and rheumatoid arthritis had "recently worsened with prolonged morning stiffness and breakthrough rashes."  (*Id.* at 42.)  Dr. Abdalla noted that, prior to incarceration, Plaintiff had been on Enbrel.  (*Id.*)  Dr. Abdalla also noted that Plaintiff had synovitis (inflammation) in all "PCP and MCP joints."  (*Id.* at 50.)  The documented plan was to prescribe folic acid and "add rheumatology consultation given his worsening and concomitant psoriatic arthritis.  Anticipate that he needs to restart Enbrel."  (*Id.* at 55.)

On April 17, 2024, provider Oyuki Coronado submitted an "eConsult" rheumatology consult for Plaintiff due to his rheumatoid and psoriatic arthritis and "recent worsening joint pains and skin eruptions."  (Doc. 41-1 at 50.)  On April 18, 2024, the eConsult specialist responded to the request with the opinion that, because "management with biological DMARDs can be complex and require familiarity with medications," referral to a rheumatologist may be indicated.  (*Id.* at 51–52.)[3]

On June 10, 2024, Plaintiff saw Physician Assistant (PA) Adrian Kelley via telemedicine for another chronic care visit for asthma and psoriatic and rheumatoid arthritis.  (*Id.* at 56, 58.)  PA Kelley documented Plaintiff's complaint of continued mild joint pains and rashes but noted that he denied swelling.  (*Id.* at 58.)  PA Kelley also noted that Plaintiff was on Enbrel prior to incarceration.  (*Id.* at 58.)  PA Kelly documented a plan to "request rheumatologist referral for RA/psoriatic arthritis" and follow up in 3 months.  (*Id.* at 71.)

---

[3] DMARD stands for Disease-Modifying Antirheumatic Drugs.

On July 25, 2024, Plaintiff saw rheumatologist Dr. Tok. (Doc. 41-1 at 35.) Dr. Tok took medical, family, and surgical histories and conducted a thorough physical examination. (*Id.* at 35–36.) Dr. Tok recommended that Plaintiff continue taking methotrexate as well as folate, and to start a biologic. (*Id.* at 36.) Dr. Tok noted she "will recommend Enbrel as he did well with it in past." (*Id.*) Dr. Tok issued the following prescription:

> Enbrel (sureclick Autoinjctr) 50 mg/1 ML, Start: 07/25/24 Solution, 1 pen sq [subcutaneous] q wk [once a week], Subcutaneous, Qty. 4, Substitutions Allowed, Refills: 0

(*Id.*) Dr. Tok administered the first dose of Enbrel via an injection, and she advised Plaintiff that he would be injected with the biologic once a week. (Doc. 41 at 7.) Dr. Tok's office drew blood for numerous lab tests. (*Id.* at 6; Doc. 41-1 at 36–37.) Dr. Tok documented her advisement of "the importance of taking meds as prescribed and complying with monitoring and follow up appts for therapy of rheumatic disease." (*Id.* at 37.) Finally, Dr. Tok ordered follow up in 3 months. (*Id.*)

Plaintiff's condition improved slightly over the next week. (Doc. 41 at 7.)

On July 29, 2024, NP Miller prescribed ibuprofen, 600 mg twice a day for arthritic pain. (Doc. 49-2 at 5.)

On July 30, 2024, a non-formulary medication request for Enbrel was submitted. (Doc. 41-1 at 39.)

On July 31, 2024, "Pharm D" Kelly Lobdell entered an Addendum into Plaintiff's medical record with an "Alert" sent to the provider stating:

> Regarding non-formulary request for Enbrel: NaphCare/ADCRR preferred biologic DMARD is Hadlima. Will also need lab results before starting any biologic (looks like labs were collected at offsite visit on 7/25/24). Once labs are uploaded to chart and underlying infection ruled out, please submit new non-formulary request for Hadlima. Thank you.

(*Id.*)

The week after his appointment with Dr. Tok, Plaintiff spoke to two nurses about the prescription for Enbrel injections; they both informed Plaintiff that he would not receive

the injections and there was no paperwork from the appointment with Dr. Tok.  (Doc. 41 at 7.)  In response to his continued inquires, medical staff repeatedly told Plaintiff that Enbrel was not on the formulary and would not be given.  (*Id.*)

On August 21, 2024, a "Patient Notification – Laboratory Test Results" medical record form was completed by NP Brenda Rosas.  (Doc. 41-1 at 40.)  This form documented that Plaintiff's laboratory test results were within acceptable limits and there was no need for further evaluation.  (*Id.*)

Meanwhile, although Plaintiff's condition slightly improved the week after the Enbrel injection by Dr. Tok, Plaintiff did not receive any other injections thereafter, and his symptoms began to worsen.  (Doc. 41 at 7.)

On September 3, 2024, Plaintiff saw NP Megan Slattery via telemedicine for a chronic care visit for asthma and psoriatic and rheumatoid arthritis.  (*Id.* at 72, 75.)  NP Slattery documented Plaintiff's complaints of mild joint pain to hands, knees, and shoulders.  (*Id.* at 75.)  NP Slattery wrote, "pending follow up with rheumatology, order was placed for Enbrel but will switch to hadlima as that [is] what is in formulary pending approval."  (*Id.* at 90.)  NP Slattery also noted a plan to order diclofenac gel for joint pain because ibuprofen was not beneficial.  (*Id.*)

On October 21, 2024, Plaintiff saw rheumatologist Dr. Tok.  (Doc. 49-2 at 31.)  The medical record from this encounter documented Plaintiff's complaint of psoriasis "patches" on hands and elbows, joint pains in neck and shoulders, and that his activities of daily living were moderately limited.  (*Id.*)  When Plaintiff reported that he was taking methotrexate but had not received any Enbrel or other biologic injections, Dr. Tok became angry.  (*Id.*; Doc. 56 at 11.)  Dr. Tok took medical, surgical, social, and family histories; conducted a thorough examination, and reviewed Plaintiff's lab results, which were reported to Dr. Tok's office on July 26, 2024.  (Doc. 49-2 at 31–33.)  Dr. Tok recommended a biologic.  (*Id.* at 34.)  She wrote that "if Enbrel is not preferred due to cost an adalimumab biosimilar q 2 wk [once every two weeks] is acceptable."  (*Id.*)  Dr. Tok prescribed methotrexate, folic acid, and Enbrel.  (*Id.*)  Dr. Tok again advised of "the importance of

taking meds as prescribed and complying with monitoring and follow up appts[.]"  (*Id.*) Dr. Tok ordered follow up in 3 months, and noted "[pls] do not send pt [patient] back if pt is noncompliant with biologic."  (*Id.*)

On December 2, 2024, a non-formulary medication request was completed by NP Patricia Miller for the medication Hadlima, 40 mg, to be delivered subcutaneously. (Doc. 41-2 at 8,10.)  NP Miller noted that this medication was "specifically recommended by rheumatology," and was to be given every other week for 90 days, starting December 2, 2024.  (*Id.* at 10.)

Also on December 2, 2024, about 45 minutes after NP Miller's medication request, "Pharm D" Kelly Lobdell completed a non-formulary medication request for Yusimry, 40 mg, to be delivered subcutaneously.  (*Id.* at 13, 17.)  Lobdell noted that this medication was requested by the rheumatologist, that the patient has psoriatic arthritis and has failed monotherapy with methotrexate, that a biologic will be added, and that they were "[u]tilizing our current preferred Humira biosimilar, Yusimry."  (*Id.* at 14.)  Yusimry was to be administrated every 2 weeks for 90 days, starting on December 5, 2024.  (*Id.* at 17.)

As of December 18, 2024, Plaintiff had still not received Yusimry or any other biologic.  (Doc. 56 at 4.)  He was receiving only Tramadol (pain medication) and methotrexate.  (*Id.*)

As of March 11, 2025, Plaintiff had not returned to see Dr. Tok for follow up since the October 21, 2024 appointment.  (Doc. 81.)

**V.    Eighth Amendment Standard**

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need."  *Id.* (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin*

*v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'"  *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)).  Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.  "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'"  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

## VI.    Discussion

### A.    Likelihood of Success

As to the objective prong of the Eighth Amendment deliberate indifference analysis, NaphCare presents no argument that Plaintiff's psoriatic and rheumatoid arthritis conditions do not constitute a serious medical need.  *See Norfleet v. Webster*, 439 F.3d 392, 395 (7th Cir.2006) (finding no dispute that rheumatoid arthritis is serious medical need); *Dittmer v. Bradshaw*, No. 12-81309-CV, 2015 WL 471371, at *5 (S.D. Fla. Feb. 4, 2015)

(osteoarthritis and rheumatoid arthritis are a serious medical need) (citations omitted). The record shows that Plaintiff's conditions were serious enough for NaphCare to label them "chronic care" conditions, that Plaintiff receives treatment and pain medication for these conditions, and that these conditions significantly affect his daily activities and cause pain. (*See* Doc. 49-1 at 8, 10; Doc. 49-2 at 5; Doc. 56 at 4; Doc. 49-4 at 2, Pacheco Decl. ¶ 4; Doc. 41-1 at 8–13.) *See McGuckin*, 974 F.2d at 1059–60. Thus, Plaintiff's conditions constituted a serious medical need.

The Court therefore turns to the second prong—whether there was deliberate indifference to Plaintiff's serious medical need.

At the outset, the Court addresses NaphCare's attempt to limit Plaintiff's claim to the denial of Enbrel. (Doc. 49 at 9.) NaphCare asserts that "Plaintiff's lone count against NaphCare pertains to Plaintiff's allegations that NaphCare has a policy of blacklisting certain medications, and, as a result, he was denied what he claims is a necessary medication to treat his arthritis condition[.]" (Doc. 49 at 8–9.) But in his Complaint, Plaintiff alleged that, despite his repeated HNRs to medical about his worsening symptoms and progressive disability when walking, his HNRs were ignored and he was never seen by a provider. (Doc. 1 at 7.) Plaintiff alleged that when he finally saw a provider he was told he would have to try an alternative treatment plan before a request for Enbrel could be made, but was never told what such an alternative treatment plan would entail, and his request to see a rheumatologist was denied. (*Id.* at 7–8.) Plaintiff further alleged that another provider, Dr. Tripp, recommended that Plaintiff be seen by a rheumatologist, yet, at the time Plaintiff filed his Complaint in September 2023, he still had not been seen by a rheumatologist or received any further treatment. (*Id.* at 9–10.) These allegations are sufficient to assert a claim against NaphCare for the denial and delay of medical care, in addition to Plaintiff's allegation that NaphCare improperly denied the medication Enbrel.

Moreover, in his pending Motion for Preliminary Injunction, Plaintiff alleges that, after his November 2023 move to ASPC-Lewis, Barchey Unit, his requests to see a rheumatologist continued to be denied, despite reports to medical of his worsening

symptoms.  (Doc. 41 at 6.)  Plaintiff alleges that after he finally saw the rheumatologist in July 2024, NaphCare refused to comply with the treatment ordered by the specialist or offer any other treatment, even though Plaintiff became unable to stand or walk for significant periods of time and suffered severe joint pain, rashes, and fatigue.  (*Id.* at 6–7.)  These allegations further support a claim against NaphCare based on the denial and delay of care and the failure to comply with specialist-recommended treatment.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (a pro se litigant can "bolster[ ] his claim by making more specific allegations . . . in later filings"); *Alvarez v. Hill*, 518 F.3d 1152, 1158 (9th Cir. 2008) (the court is required to afford a pro se litigant "the benefit of any doubt in ascertaining what claims he raised in his compliant and *argued to the district court*") (emphasis in original) (quoting *Morrison v. Hall*, 261 F.3d 896, 899 n.2 (9th Cir. 2001).

The record shows that in 2023 Plaintiff filed HNRs and grievances to report worsening symptoms that affected daily living activities, but his repeated requests for Enbrel and to see a rheumatologist were denied.  (*See* Doc. 41-1 at 8, 9, 11–13, 23; Doc. 41 at 5.)  In August 2023, Dr. Tripp determined Plaintiff's current medication regimen was ineffective and submitted a request for Enbrel, and he documented "consider referral to rheumatologist."  (Doc. 41 at 6; Doc. 41-1 at 5.)  But Plaintiff did not receive Enbrel or see a rheumatologist after the encounter with Dr. Tripp.  The record further shows that, in February 2024, Dr. Abdalla documented worsening symptoms, including joint inflammation, and submitted a rheumatology consult.  (Doc. 49-1 at 42, 50, 55.)  In April 2024, through "eConsult," a rheumatologist recommended a rheumatology consult based on Plaintiff's worsening joint pains and skin eruptions and due to the complexity of managing medications necessary for treatment.  (Doc. 41-1 at 50–52.)  Plaintiff was finally taken to a rheumatologist in July 2024.  (Doc. 41-1 at 35.)

NaphCare argues that Plaintiff has been seen repeatedly every three months to address his arthritic conditions.  (Doc. 49 at 2.)  But the fact that Plaintiff was seen is meaningless if the medical staff failed to respond to or treat Plaintiff's serious medical need.  *See Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical

staff is meaningless unless that staff is competent and can render competent care"); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have to prove that he was completely denied medical care to support deliberate indifference claim). As Plaintiff wrote in a May 2023 grievance, in one telemedicine appointment where the provider informed Plaintiff that Enbrel would not be approved and he would have to try an alternative treatment plan, the provider did not explain any alternative treatment plan, thereby giving Plaintiff no meaningful treatment for his serious medical need. (Doc. 41-1 at 11–12.)

NaphCare also argues that there were only "minor delays in scheduling" the July 2024 rheumatologist appointment. (Doc. 49 at 9.) But Dr. Tripp noted "consider referral to rheumatologist" in August 2023, some 11 months before the appointment. (Doc. 41-1 at 5.) Dr. Abdalla submitted a rheumatology consult in February 2024, five months before the appointment. (Doc. 49-1 at 55.) These are significant delays.

For more than a year prior to the July 2024 rheumatologist appointment, Plaintiff repeatedly requested Enbrel and a rheumatologist appointment, yet NaphCare provided only methotrexate, a multi-vitamin and, from June to September 2023, an ointment. (Doc. 49-2 at 27–29.) In August 2023, this treatment regimen was determined to be ineffective. (Doc. 41 at 6.) A provider added folic acid in February 2024. (Doc. 42-9 at 27.) Plaintiff's symptoms, joint swelling, and pain continued to worsen. Despite Plaintiff's worsening condition and providers' recommendations, NaphCare refused to provide Enbrel (a proven effective medication) or any comparable alternative medication, and delayed bringing Plaintiff to a rheumatologist until July 2024. This delay, during which NaphCare refused to provide any substantive treatment, reflects deliberate indifference. *See Arnett v. Webster*, 658 F.3d 742, 752 (7th Cir. 2011) (holding that, where the prisoner suffered from rheumatoid arthritis (RA), "[e]ven if the prison couldn't get Enbrel because it wasn't on the formulary, medical personnel cannot stand idly by for more than ten months while [the plaintiff's] RA progressively worsened and caused permanent damage to his joints; they must explore alternative treatments that are available").

Plaintiff argues that NaphCare failed to comply with the treating rheumatologist's recommendations and orders following the July 25, 2023 specialist appointment. (Doc. 41.)  At that appointment, labs were drawn and Dr. Tok prescribed weekly Enbrel injections to be added to Plaintiff's current medication regimen of methotrexate and folic acid.  (Doc. 41-1 at 36.)  In fact, Dr. Tok started the Enbrel treatment by injecting Plaintiff at the appointment.  (Doc. 41 at 7.)  Despite Dr. Tok's prescription and initiation of the treatment, NaphCare argues that it "was . . . determined that multiple labs had to first be conducted, and then, if underlying infection was ruled out, the biologic that would need to be ordered was one comparable to Enbrel."  (Doc. 49 at 4.)  In support, NaphCare cites Dr. Tok's July 25, 2024 medical record, but there is nothing in the record stating that lab results needed to be received and reviewed before administration of the treatment, and Dr. Tok's injection of Plaintiff directly contradicts such a suggestion.  (*Id.*, citing Doc. 41-1 at 34–37.)  It was Kelly Lobdell "Pharm D" who noted in a July 31, 2024 record that they will "need lab results before starting any biologic (looks like labs were collected at offsite visit on 7/25/2024.)"  (Doc. 41-1 at 39.)  There is no indication that Lobdell is a provider or a physician, much less a rheumatologist or related specialist.  Yet based on this note, the specific treatment ordered and started by the treating specialist was stopped.

Even if NaphCare required the lab results before authorizing Enbrel or a similar medication, they were already available when Lobdell made this medical note.  According to the records, Plaintiff's lab results were reported to Dr. Tok's office on July 26, 2024.  (Doc. 49-2 at 32 ("results reported on 7/26/2024").)  NaphCare knew Dr. Tok's office collected the labs as evidenced by Lobdell's July 31, 2024 note, yet failed to timely inquire about the results, despite its claim that the results were needed before complying with Dr. Tok's order to continue Enbrel injections.  The record shows that three weeks later on August 21, 2024, a NaphCare NP notified Plaintiff that his lab results were all within normal limits.  (Doc. 41-1 at 40.)  Thus, NaphCare had the lab results and Enbrel—or a substitute biologic—treatment could have resumed.  No such treatment was provided.  Instead, Naphcare speciously asserts that "Plaintiff was then sent back to the

1   rheumatologist following the labs, to confirm recommended treatment, on October 21,
2   2024." (Doc. 49 at 4.)  At the October 21, 2024 follow-up appointment, Dr. Tok was angry
3   when she learned NaphCare had not been administering the Enbrel treatment as ordered.
4   (Doc. 56 at 11.)

5       NaphCare failed to comply with Dr. Tok's July 25, 2024 unequivocal
6   recommendation for Enbrel (or a substitute biologic) treatment.

7       At the October 21, 2024 appointment, Dr. Tok again prescribed Enbrel or a
8   substitute biologic and ordered that Plaintiff return for a follow-up appointment in three
9   months.  (Doc. 49-2 at 34.)  Despite NaphCare's representation to the Court that treatment
10  with a substitute biologic, Yusimry, was supposed to begin on December 5, 2024, Plaintiff
11  had still not received Yusimry or any other biologic when he filed his Reply on
12  December 18, 2024.  (Doc. 49-4, Pacheco Decl. ¶ 5; Doc. 56 at 4.)  And although the 3-
13  month follow-up appointment should have occurred in late January 2025, as of March 11,
14  2025, no follow up has occurred.  (Doc. 81.)

15      The Ninth Circuit has held that failure to follow a specialist's recommendation may
16  amount to a course of treatment that is medically unacceptable.  *See Colwell v. Bannister*,
17  763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials
18  "ignored the recommendations of treating specialists and instead relied on the opinions of
19  non-specialist and non-treating medical officials who made decisions based on an
20  administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the
21  treating physician and specialist recommended surgery, a reasonable jury could conclude
22  that it was medically unacceptable for the non-treating, non-specialist physicians to deny
23  recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*,
24  744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999)
25  (the defendant physician's refusal to follow the advice of treating specialists could
26  constitute deliberate indifference to serious medical needs).

27      The record shows that NaphCare failed to follow the treating specialist's
28  recommendations to administer Enbrel or a substitute following the July 25, 2024

appointment; failed to timely administer Enbrel or Yusimry after the October 21, 2024 appointment; and failed to return Plaintiff for the 3-month follow-up appointment. Based on the above case law, NaphCare's conduct likely constitutes deliberate indifference.

Accordingly, there exists a likelihood of success on the merits of Plaintiff's claim against NaphCare.

### B. Irreparable Injury

Plaintiff must demonstrate that absent an injunction he will be exposed to irreparable harm. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see Winter*, 555 U.S. at 22. "[T]here must be a presently existing threat of harm, although injury need not be certain to occur." *Villaneuva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir. 1997)). To support a mandatory preliminary injunction for specific medical treatment, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury. *See Conn. v. Mass.*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Caribbean Marine*, 844 F.2d at 674. Delays in necessary treatment and pain can constitute irreparable harm. *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment, and increased pain); *McNearney v. Wash. Dep't of Corrs.*, No. C11-5930 RLB/KLS, 2012 WL 3545267, at *14 (W.D. Wash. June 15, 2012) (finding a likelihood of irreparable injury where the evidence showed that the plaintiff continued to suffer unnecessary pain due to the defendants' inadequate treatment plan); *Von Collin v. Cnty. of Ventura*, 189 F.R.D. 583, 598 (C.D. Cal. 1989) ("[d]efendants do not argue that pain and suffering is not irreparable harm, nor could they").

NaphCare argues that Plaintiff cannot show irreparable harm because he "is being treated consistently, repeatedly and adequately for his arthritic condition," he has only experienced mild joint pain and plaque breakouts on his knuckles and elbows, he is not bedridden, and he is not communicating debilitating pain to his providers. (Doc. 49 at 11.)

The record does not support NaphCare's argument.  NaphCare has not followed the treating specialist's treatment recommendations or provided any effective alternative treatment. Thus, Plaintiff has not been treated adequately.  At Plaintiff's last medical encounter, Dr. Tok documented that Plaintiff had psoriasis on his hands and elbows, joint pain in his neck and shoulders, and that his activities of daily living are moderately limited.  (Doc. 49-2 at 31.)

Plaintiff asserts that he is subject to irreparable harm because his symptoms have progressively worsened; he is deteriorating; he suffers severe joint pain, rashes, and fatigue; at times he has been unable to stand or walk for significant periods of time; and his pain is worsening.  (Doc. 41 at 6–7, 18; Doc. 56 at 14.)

Plaintiff relies on *Farnam v. Walker*, which addressed a preliminary injunction motion brought by a prisoner with cystic fibrosis.  593 F. Supp. 2d 1000, 1004–07 (C.D. Ill. 2009).  There, the plaintiff brought a lawsuit seeking specific treatment for his condition after prison officials confiscated his "flutter valve" device used to clean his airways and substituted Plaintiff's prescription medication and fat-soluble vitamins with alternatives that were harmful to the plaintiff and ineffective at treating his condition.  *Id.* at 105–109. The plaintiff saw a pulmonologist who specializes in cystic fibrosis and recommended that the plaintiff receive the primary relevant protocols for cystic fibrosis treatment: an airway clearance device, the inhaled form of an antibiotic, pancreatic enzymes, fat soluble vitamins, and annual evaluations at a cystic fibrosis center.  *Id.* at 1006–1010.  After the specialist issued his report with these recommendations, the plaintiff received everything except an evaluation at a cystic fibrosis center "or any enforceable commitment that, once he is seen at a Cystic Fibrosis Center, the recommendations of the Cystic Fibrosis Center will be followed." *Id.* at 1010.  The district court found a risk of irreparable harm remained because (1) the plaintiff demonstrated a likelihood of success on the merits, (2) he was only provided with the relevant treatment protocols after appearance of counsel and the specialist's report, (3) the plaintiff still had not been established as a patient at a cystic fibrosis center, (4) the defendants had not made an enforceable commitment to continue

providing necessary treatment after resolution of the case, (5) continuation of treatment was not a reasonable assumption after the defendants' past conduct, and (6) the defendants still maintained that the plaintiff's serious medical needs were being met and he had no acute problem. *Id.* at 1013.[4]

This case presents a very similar scenario. Plaintiff has demonstrated a likelihood of success on the merits and he has not been provided all the treatment recommended by the treating specialist. NaphCare's claim that Plaintiff was going to receive Yusimry as an alternative to Enbrel came only after Plaintiff filed his Motion for Preliminary Injunction and the Court ordered NaphCare to respond. (*See* Docs. 41, 42, 49.) Although NaphCare asserts that Plaintiff is scheduled to see the rheumatologist next week, there is no evidence to support this assertion. (Doc. 84.) In light of NaphCare's prior conduct—failing to follow Dr. Tok's July 25 and October 21, 2024 orders and failing to follow through on their claim that biologic injections would start on December 5, 2024—it is not reasonable to assume that Plaintiff will see a specialist next week or that NaphCare will comply with the specialist's recommendations.

NaphCare maintains that Plaintiff's serious medical needs are being met and that he is not bedridden or at risk of death. (Doc. 49 at 11.) As discussed in *Farnam*, under the Supreme Court's holding in *Helling v. McKinney*, the Eighth Amendment "protects against further harm" as well as current harm, and a prisoner-plaintiff does not have to wait for something catastrophic to occur before being entitled to injunctive relief. 593 F. Supp. 2d at 1012 (quoting 509 U.S. 25, 33 (1993)). Plaintiff does not have to wait until his progressive rheumatoid arthritis worsens to the point of his being bedridden before he is entitled to injunctive relief. Plaintiff has demonstrated worsening symptoms and pain as a result of NaphCare's poor treatment and its failure to follow the specialist's treatment recommendations.

---

[4] NaphCare did not address *Farnam* or challenge Plaintiff's reliance on the case. (*See* Doc. 49.)

Finally, Plaintiff argues that he has no adequate remedy at law to prevent irreparable harm because money damages are an inadequate remedy for further damage and debilitating symptoms caused by his condition. (Doc. 41 at 19.)  *See Farnam*, 593 F. Supp. 2d at 1013 (stating that "[w]hether the plaintiff has an adequate remedy at law seems substantially the same question as whether he will suffer irreparable injury," and concluding that "[m]oney hardly seems an adequate remedy . . . for significant pain and suffering from increased symptoms").  NaphCare does not address this argument.  (*See* Doc. 49.)  The Ninth Circuit has held that "the deprivation of [a prisoner's] constitutional right to adequate medical care is sufficient to establish irreparable harm."  *Porretti*, 11 F.4th at 1050 (quoting *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798) (9th Cir. 2019)); *see Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm"), *rev'd and remanded on other grounds*, 562 U.S. 134 (2011).

For the above reasons, Plaintiff satisfies the second *Winter* element.

## C.    Balance of Equities/Public Interest

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (quotation omitted).  NaphCare insists that entering any injunctive relief order would force it to "restructure[e] the procedures and policies for one single inmate and which could result in security and safety breaches, inmate unrest and staffing issues[.]"  (Doc. 49 at 12.) But NaphCare also asserts that the treatment sought in Plaintiff's motion has already occurred or is underway.  (*Id.*)  NaphCare provides no evidence to support its fears of security breaches and inmate unrest if it is ordered to provide adequate medical care. Because an injunction would simply direct NaphCare do what it already claims to be doing, there is no basis for such fears.  Accordingly, the balance of equities tips sharply in Plaintiff's favor.

1    As noted above, "it is always in the public interest to prevent the violation of a

2  party's constitutional rights." *Porretti*, 11 F.4th at 1047. Moreover, "the public has a

3  strong interest in the provision of constitutionally-adequate health care to prisoners."

4  *McNearney*, 2012 WL 3545267, at *16 (quoting *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993

5  (E.D. Wis. 2009)); *see Farnam*, 593 F. Supp. 2d at 1017 (holding that the public had an

6  interest in the maintenance of prisoner's health during the pendency of the lawsuit). Here,

7  it is in the public interest to ensure that Plaintiff receives constitutionally adequate health

8  care as prescribed by the treating specialist. Thus, the public interest weighs in favor of

9  granting an injunction.

10    **D.    Narrowly Tailored Relief**

11    The PLRA requires any injunctive relief to be narrowly drawn and the least intrusive

12  means necessary to correct the harm. 18 U.S.C. § 3626(a)(2).

13    In his Motion, Plaintiff made five specific requests for relief: (1) to see Dr. Tok

14  within 14 days; (2) that all Dr. Tok's orders and recommendations be promptly followed;

15  (3) the administration of Enbrel; (4) that Plaintiff receive physical therapy; and (5) that

16  Defendants be required to file notices of compliance every 30 days. (Doc. 41 at 1–2, 20.)

17    The Court will grant Plaintiff's Motion as to the request to see Dr. Tok within 14

18  days. The Court recognizes the security concerns and reasons for withholding from

19  prisoners the exact dates and times of upcoming appointments. Therefore, the Court will

20  direct NaphCare to file a Notice, under seal, indicating the date of Plaintiff's appointment

21  with Dr. Tok. Further, because a specialist appointment is meaningless if the specialist's

22  treatment orders are not followed, the Court will also grant Plaintiff's request for an order

23  directing NaphCare to comply with all Dr. Tok's recommendations made at this

24  appointment.

25    As to Plaintiff's request for Enbrel, Dr. Tok previously specified that a substitution

26  is allowed, specifically, an adalimumab biosimilar. (Doc. 81 at 7.) Because this order

27  incorporates a directive that NaphCare follow Dr. Tok's medication and injection

28  recommendations made at the upcoming follow-up appointment, Plaintiff's request for an

order for Enbrel will be denied. It follows, however, that if Dr. Tok prescribes Enbrel and indicates that a substitute is no longer permitted, NaphCare must follow that recommendation.

This order for relief is sufficiently narrow to satisfy the requirements of the PLRA.

### E.    Bond Requirement

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite this mandatory language, "Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation omitted). The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct. *Id.*

NaphCare has not requested a bond or submitted any evidence regarding likely damages. It is also difficult to envision how NaphCare would incur compensable costs or damages. Accordingly, the Court will waive the bond requirement.

**IT IS ORDERED:**

(1)    The reference is withdrawn as to Plaintiff's Motion for Leave to Supplement Briefing (Doc. 81) and the Motion is **granted**.

(2)    Plaintiff's Motion for Preliminary Injunction (Doc. 41) is **granted in part** as follows:

(a)    Defendant NaphCare must immediately schedule Plaintiff for a follow-up appointment at Dr. Tok's office to occur within **14 days** from the date of this Order:

(b)    Within **5 days** of the date of this Order, Defendant NaphCare must file a Notice, under seal, with the date of Plaintiff's follow-up appointment at Dr. Tok's office.

(c)     Defendant NaphCare must provide any treatment, medications, procedures, injections, tests, therapy, and follow-up recommended by Dr. Tok or one of her residents at the follow-up appointment.

(d)     Within **10 days** of Plaintiff's follow-up appointment with Dr. Tok, Defendant NaphCare must file a Notice, supported by medical records and a sworn statement from an official with personal knowledge, stating Dr. Tok's recommendations and the steps NaphCare is taking to follow the recommendations.

(3)     This relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct the harm.  See 18 U.S.C. § 3626(a)(2).

(4)     This Order shall remain in effect until further notice from the Court.

(5)     Plaintiff is not required to post bond.

Dated this 4th day of April, 2025.

David G. Campbell
Senior United States District Judge